IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARRY LAUGHMAN,       : CIVIL ACTION
              Plaintiff    :
                         :
      v.            : No.
                         :
COMMONWEALTH OF     :
PENNSYLVANIA, COUNTY OF  :
ADAMS, ADAMS COUNTY    :
DISTRICT ATTORNEY'S OFFICE, :
 JOHN J. a/k/a "JACK" HOLTZ,  :
 JANICE ROADCAP,        :
DONALD BLEVINS, ESTATE OF :
RONALD M. SHARPE,      :
GLENN A. WALP,         :
JAMES B. HAZEN AND PAUL  :
J. EVANKO,           :
        Defendants    :     ELECTRONICALLY FILED

## PLAINTIFF'S COMPLAINT

AND NOW comes the Plaintiff, Barry Laughman, by and through his attorneys, William C. Costopoulos, Esquire, and Leslie M. Fields, Esquire, COSTOPOULOS, FOSTER & FIELDS, and respectfully represents as follows in support of this Complaint:

## INTRODUCTION

1.  This is a civil rights complaint for monetary damages for the extraordinary injuries sustained by Plaintiff, Barry Laughman, who was wrongfully and with malicious intent, arrested, tried, convicted, sentenced and incarcerated for over 16

years for a rape, murder and related crimes that he did not commit.

2.  The wrongful arrest and conviction primarily stemmed from a false and fabricated "confession" obtained from Plaintiff, Barry Laughman, by Pennsylvania State Police troopers and from the "junk science" testimony of a Pennsylvania State Police crime laboratory chemist.

**PARTIES**

3.  Plaintiff, Barry Laughman, is an adult individual residing at 12 East Hanover Street, Hanover, Pennsylvania 17331.

4.  Defendant, Commonwealth of Pennsylvania, has a main business address at the Office of Attorney General, 1600 Strawberry Square, Harrisburg, Dauphin County, Pennsylvania 17120.

5.  Defendant, County of Adams, is a political subdivision of the Commonwealth of Pennsylvania and has a main business address at the Adams County Courthouse, 111-117 Baltimore Street, Gettysburg, Adams County, Pennsylvania 17325.

6.  Defendant, Adams County District Attorney's Office, is the prosecuting agency of the County of Adams and has its main business address at the Adams County Courthouse, 111-117 Baltimore Street, Gettysburg, Adams County, Pennsylvania 17325.

7.   Defendant, John J. a/k/a "Jack" Holtz, is an adult individual residing at 12199 Fritz Court, Lillian, Alabama 36549-4046.   At all times relevant herein, Defendant Holtz was a trooper with the Pennsylvania State Police.

8.   Defendant, Janice Roadcap, is an adult individual residing at 3817-B Peters Mountain Road, Halifax, Dauphin County, Pennsylvania 17032.  At all times relevant herein, Defendant Roadcap was a chemist with the Pennsylvania State Police.

9.   Defendant, Donald Blevins, is an adult individual residing at 942 Fairfield Road, Gettysburg, Adams County, Pennsylvania 17325-7243.  At all times relevant herein, Defendant Blevins was a trooper with the Pennsylvania State Police.

10.   Defendant, Estate of Ronald M. Sharpe, has an address at 6175 Spring Knoll Drive, Harrisburg, Dauphin County, Pennsylvania 17111.  Upon information and belief, Mr. Sharpe, who is deceased, served as the commissioner of the Pennsylvania State Police from 1987 into 1991.

11.   Defendant, Glenn A. Walp, is an adult individual residing in Santa Fe, New Mexico.   Upon information and belief, Defendant Walp served as the commissioner of the Pennsylvania State Police from 1991 into 1995.

12.   Defendant, James B. Hazen, is an adult individual residing at 7706 Farmdale Avenue, Harrisburg, Dauphin County, Pennsylvania 17112.   Upon information and belief, Defendant Hazen served as the commissioner of the

Pennsylvania State Police in 1995.

13. Defendant, Paul J. Evanko, is an adult individual residing at 1131 Elizabeth Court, Harrisburg, Dauphin County, Pennsylvania 17112. Upon information and belief, Defendant Evanko served as the commissioner of the Pennsylvania State Police from 1995 into 2003.

14. At all times and in all things, Defendants Holtz, Roadcap, Blevins, Sharpe, Walp, Hazen and Evanko acted under the color of state law.

**JURISDICTION**

15. This civil rights cause of action is brought pursuant to 42 U.S.C.A. 1983 and 42 U.S.C.A. 1988, and this Honorable Court has jurisdiction under 28 U.S.C.A. 1331, 28 U.S.C.A. 1343 and 28 U.S.C.A. 1367. State and federal claims herein arise out of a common set of operative facts and this Honorable Court, therefore, has jurisdiction over the entire matter pursuant to F.R.C.P. 54(b).

**VENUE**

16. Venue is appropriate in the Middle District of Pennsylvania because the operative conduct occurred primarily in Adams County and Dauphin County, Pennsylvania, and Defendants reside and/or previously conducted business herein.

**BACKGROUND FACTS**

17. On August 13, 1987, 85-year old Edna Laughman was found raped and

murdered in her home in Oxford Township, Adams County, Pennsylvania.

18.  A neighbor, Royce Emerson, told the State Police that he saw a stranger walking behind his home on the morning of August 13, 1987, he confronted him, the stranger indicated he was coming from homes behind the fields, the stranger appeared to take a cigarette from a Marlboro box and he walked off in the direction of Edna Laughman's home; Mr. Emerson personally knew Plaintiff, Barry Laughman, and thus Mr. Laughman was not the stranger he encountered.

19.  The State Police drew a sketch of this stranger based on Mr. Emerson's descriptions, began stopping cars on Route 94 and asked whether anyone had seen him.

20.  A soil sample taken from where Mr. Emerson last saw the stranger matched a soil sample taken from a footprint found in Edna Laughman's house.

21.  The State Police never identified this stranger and gave up looking for him after the arrest of Plaintiff, Barry Laughman.

22.  Defendant Trooper Holtz was assigned by the Pennsylvania State Police to oversee the investigation.

23.  On August 18, 1987, his first day on the investigation, Defendant Trooper Holtz, according to his later testimony, solved the case.

24.  Defendant Trooper Holtz testified that while interviewing relatives at the

crime scene, he handed Plaintiff, Barry Laughman, a can of snuff and noticed that his pinkie finger did not bend properly (Mr. Laughman had injured it as a child).

25.  Defendant Trooper Holtz testified that he connected this little finger issue to three bruises he saw on the victim's arm that he assumed were grip marks; because there were only three, he inferred that the marks were left by someone who had a problem using one of his fingers.

26.  Two weeks after the murder, a couple, Elwood Bolllinger and Patricia Harrison, came to see Defendant Trooper Blevins and reported that on the morning of August 13, 1987, they were on their way to a doctor's appointment and saw the victim in her back yard at about 9 a.m.; Ms. Harrison told the police that she had remarked, "there's that poor old soul," as they passed her.

27.  However, Defendant Trooper Blevins told them that they must have had the wrong date because the police had concluded that Ms. Laughman had been murdered on the night of August 12th.

28.  Defendants Troopers Holtz and Blevins questioned Plaintiff Laughman again on August 27, 1987 at the Gettysburg State Police barracks.  Under questioning, Mr. Laughman said he had been drinking beer with his brother the evening before the victim was found and that he could not go to bed because another brother was in the room they shared with his (the brother's) girlfriend.

29.  Plaintiff Laughman told the police that he fell asleep on the couch and did not get up the next morning until his father woke him to go to work.

30.   Plaintiff Laughman at first told the police that he did not own "tennis shoes" but later said that he had black high-top sneakers, later explaining that he did not consider sneakers to be tennis shoes; the police, however, considered this to be an inconsistent statement.

31.  Plaintiff Laughman's sneakers, it was later determined, did not match a footprint found in the victim's home; it was a different brand and size.

32.  Defendants Troopers Holtz and Blevins asked Plaintiff Laughman and his father to return to the barracks for more questioning on September 8, 1987; they did.

33.   Upon arrival at the barracks, Defendant Trooper Holtz took Plaintiff Laughman into an interview room alone.

34.  Plaintiff Laughman, who was 24 years of age at the time, had an IQ of 69-71, which was lower than 97.5 percent of the population.  He was classified as "a moron" under then existing mental health classifications; today he would be considered mildly retarded.

35.  Defendant Trooper Holtz told Plaintiff Laughman that his family had said that he had not been out in the yard drinking with his brother, David, and that his brother said that he was taking medication and could not drink alcohol; at trial his

family disputed that they gave this account to police.

36.  According to Defendant Trooper Holtz, during the interrogation Plaintiff Laughman changed his story to say that he had been drinking with his other brother, Tim.

37.  Defendant Trooper Holtz then told Plaintiff Laughman that the killer had smoked Marlboro cigarettes and that Marlboro box tops had been found in his yard; Mr. Laughman said that he smoked Marlboros and would frequently tear off the box tops.

38.  Defendant Trooper Holtz testified: "Barry was told that a fingerprint was found on the fliptop box that was left in Edna's house, that the fingerprint had a whorl pattern.  Barry was then told to look at his right index finger because it also contained a whorl pattern."  *See* Trial N.T. 603.

39.  Defendant Trooper Holtz said that Plaintiff Laughman became nervous and was eyeing the box top he had lying in a plastic bag on a table.  Defendant Trooper Holtz picked it up and asked Plaintiff Laughman if he would tell him the truth about what happened that night.

40.  After about an hour of interrogation, Defendant Trooper Holtz signaled to Defendant Trooper Blevins to come into the room and that Plaintiff Laughman had something to say.

41.  According to Defendants Troopers Holtz and Blevins, Plaintiff Laughman said that he would tell them what really happened if they did not tell his parents.

42.  Defendant Trooper Blevins took notes while Defendant Trooper Holtz interrogated Plaintiff Laughman.  Eventually, according to the defendants, Plaintiff Laughman confessed, saying: he had gone to get a soda at a nearby car lot and had climbed into the victim's bedroom window; he hit her with a flashlight he was carrying; he stuffed pills in her throat and pinched her nose shut while stroking her throat to get her to choke on the pills; he raped her and stole $400 from a bag she kept pinned to her bra to make it look like a robbery instead of a rape; he disposed of the bag the next day in a dumpster at a furniture store; he spent the money on beer and food; and he said he did it because he could "never ever" get a girl.

43.  According to Defendant Trooper Holtz's notes, he asked Plaintiff Laughman whether he put pills in her mouth; whether he grabbed her by the wrists; whether he smoked cigarettes in her house; and whether he smoked more than one cigarette.

44.  Defendant Trooper Holtz said Plaintiff Laughman admitted things known only to the killer.

45.  Although Defendant Trooper Holtz had a tape recorder, there is no tape of Plaintiff Laughman's confession; on the tape, Defendant Holtz is heard reading the

statement to Plaintiff Laughman and asking him whether it is correct; Plaintiff Laughman is only heard saying "yes."

46.    At trial, Plaintiff Laughman was asked to read the Miranda warnings and his signed confession but he could not make out nearly every other word and, according to the Court, it took him about 8 minutes to read: "You have an absolute right to remain silent and that anything you say can and will be used . . . ." *See* Trial N.T. 867-868.

47.    Plaintiff Laughman testified at trial that he did not kill Edna Laughman, a neighbor and distant relative whom he had known his entire life and loved and called "Aunt Edna." In fact, he acted as a caretaker, bringing firewood for her wood stove regularly and assisting her in similar ways; she ate dinner with his family almost every day and they discovered her body after she failed to show up for dinner that day. *See* Trial N.T. 854, 862.

48.    Plaintiff Laughman testified at trial that Defendant Holtz repeatedly told him that he did not believe his story and said: "[W]hy don't you just tell us? We know you did it." *See* Trial N.T. 869, 876.

49.    Plaintiff Laughman was asked at trial by his lawyer: "What did you think was going to happen if you agreed with them?" His response: "That they would let me alone." *See* Trial N.T. 878.

50. Plaintiff Laughman testified at trial that he did not tell Defendants Troopers Holtz and Blevins that he killed Edna Laughman. *See* Trial N.T. 985-986.

51. Plaintiff Laughman's "confession" was false and fabricated.

52. On September 8, 1987, pursuant to a criminal complaint and affidavit of probable cause executed by Defendant Trooper Blevins, the Plaintiff, Barry Laughman, was arrested and charged with first-degree murder, second-degree murder, third-degree murder, robbery and burglary; he was incarcerated without bail in the Adams County jail.

53. On September 9, 1987, Defendants Troopers Blevins and Holtz obtained a search warrant, searched the home of Plaintiff, Barry Laughman, and found an inoperable flashlight that was so light the troopers did not think it had batteries; this was the weapon the troopers determined that Plaintiff used to knock out the victim, leaving a 2-inch bruise on the back of her head. Blood samples were also obtained from Plaintiff pursuant to a search warrant.

54. After the arrest, Mr. Bollinger and Ms. Harrison, the couple who had previously told police that they had seen the victim at about 9 a.m. on August 13, 1987 (at a time the police considered that she was dead), returned to Defendant Trooper Blevins and insisted that they had seen her in her back yard at that time. They testified, however, that Defendant Trooper Blevins told them that they "must believe

in ghosts" because she was dead the night before.

55.    At the time the Plaintiff, Barry Laughman, had a girlfriend with whom he had a sexual relationship and to whom he had proposed marriage, which contradicted the statement allegedly made in his confession that the reason he raped and killed the victim is that he could "never ever" get a girl.   The police never interviewed his girlfriend and she was not asked these questions at trial.

56.    Defendants Troopers Holtz and Blevins repeatedly questioned the family of Plaintiff, Barry Laughman, as to the night in question and were repeatedly told the same, consistent story: Mr. Laughman was drinking beer, watched TV and went to sleep.

57.    Defendant Trooper Blevins obtained a search warrant on September 9, 1987 based on the following set forth in the affidavit of probable cause:  "At the time of the autopsy, Dr. Mihalakis took sperm from the body of the deceased.  This sperm was transported to the Pennsylvania State Police Crime Laboratory.  On, or about, August 31, 1987, this sperm was tested by Janice Roadcap.  These tests indicated that the sperm was from a person of type 'A' blood.  On September 8, 1987, Barry James Laughman was questioned by the Pennsylvania State Police and admitted that he had intercourse with the deceased and had ejaculated in her on August 12, 1987."

58.    According to the police, blood-type testing of the cigarette butts found at

the scene of the crime and those left by Plaintiff, Barry Laughman, in the interrogation chamber were inconclusive.

59.    Both Plaintiff, Barry Laughman, and the victim were among those individuals whose blood type is secreted into their bodily fluids, such as sweat, saliva and semen.

60.  The blood of Plaintiff, Barry Laughman, was drawn pursuant to the search warrant (which identified the sperm on the victim's body as that of a type-A secretor), tested, and it was determined by Defendant, Janice Roadcap that he was a type-B secretor.

61.  After learning of the incongruous lab results, Defendant, Janice Roadcap, went back to her original lab notes and added writing in the margins that swabs taken of the semen "were moist when placed in vials.  Breakdown of B antigens could have occurred."

62.  Defendant, Janice Roadcap, would offer other, differing theories of the blood-type incongruity at trial, including that bacteria could have attacked the B antigens; the victim's vaginal secretions (type A) could have overridden the blood type of Plaintiff, Barry Laughman (type B); the secretor's antigen material was weak; or the antibiotics that the victim was taking for a urinary tract infection could have changed the blood type.  *See* Trial N.T. 144-148.

63.   However, rather than re-testing all three samples or testing them for bacteria or other contamination, Defendant, Janice Roadcap, did nothing, returned the evidence back to Defendants Troopers Holtz and Blevins, who stored it in an evidence locker for 8 months where it degraded and was rendered useless for further testing by the defense.

64.  The opinions and trial testimony of Defendant, Janice Roadcap, were "junk science" and had no basis in science or in fact.

65.   Roy Keefer, then District Attorney of Adams County, personally prosecuted Plaintiff, Barry Laughman, at trial and decided to seek the death penalty.

66.  Plaintiff, Barry Laughman, was defended by Jeff Cook, then Chief Public Defender of Adams County.

67.  A trial by a death-qualified jury was held from December 12 to 16, 1988 before the Honorable Oscar Spicer, then President Judge of Adams County.

68.  Plaintiff, Barry Laughman, was convicted of first-degree murder, rape, robbery and burglary; after the death-penalty hearing, the jury sentenced him to life imprisonment.

69.  Timely post-trial motions were filed and denied by the Court on July 3, 1990.

70.  On August 15, 1990, Plaintiff, Barry Laughman, was sentenced to life

imprisonment for first-degree murder, 50 months to 20 years for rape, 50 months to 20 years for robbery, and 8 months to 20 years for burglary.

71.  A timely appeal to the Superior Court of Pennsylvania was filed.

72.  The judgment of sentence was affirmed by the Superior Court on July 12, 1991, which relied on the "confession" and Defendant Roadcap's testimony in rejecting the challenge to the sufficiency of the evidence:

> Finally, appellant contests the sufficiency of the evidence, arguing that scientific evidence logically excluded him as a suspect.  In particular, appellant notes that the police had initially sought a suspect with type A blood based upon lab tests administered by criminologist Janice Roadcap.  Ms. Roadcap had tested fluids taken from various parts of the deceased body by Dr. Isidore Mihalakis pursuant to an autopsy.  Since appellant has type B blood, he concludes that it was impossible for the jury to conclude that he was the perpetrator with regard to the pertinent crimes.  We disagree.

>           \*                   \*                 \*

> Despite appellant's protestations, we fail to find that the blood issue renders the evidence insufficient in this case.  Specifically, we find that the jury was presented sufficient evidence with regard to the pertinent crimes.  At trial, Ms. Roadcap proffered several explanations for the blood discrepancy. . . .   In light of the Commonwealth's remaining strong evidence, including appellant's confession, we fail to find the evidence insufficient with regard to the aforementioned crimes.  Accordingly, we affirm the lower court's decision with regard to this issue.

*See* mem. op. at 6-8.  *Commonwealth v. Laughman,* 414 Pa.Super. 649, 598 A.2d 1330 (1991)(unpublished memorandum opinion).

73. A timely petition for allowance of appeal was filed with the Supreme Court of Pennsylvania and denied on March 26, 1992. *See Commonwealth v. Laughman,* 529 Pa. 663, 604 A.2d 1030 (1992).

74. In approximately October 1993, Plaintiff, Barry Laughman, filed a pro se petition under the Pennsylvania Post-Conviction Relief Act (PCRA), the Court appointed Mark Beauchat, Esquire, to represent him and an amended PCRA petition was filed.

75. At the PCRA hearing, Judge Spicer ordered that the record remain open and pending.

76. Prior to trial, the public defender representing Plaintiff, Barry Laughman, was provided with 18 swabs and 6 microscopic slides of semen taken from the victim's body for DNA testing but was unsuccessful in having the materials tested; no DNA evidence was introduced at trial.

77. After trial, the Court ordered that the aforesaid evidence be turned over to the public defender for further testing but again it was unsuccessful apparently because there was insufficient material to test; the materials remained in his possession.

78. The materials were subsequently turned over to the post-conviction attorney of Plaintiff, Barry Laughman, who, in 1994, submitted them to Professor

Mark Stoneking at Pennsylvania State University who was employing cutting-edge techniques in DNA testing.

79.  According to Professor Stoneking, he was able to obtain a DNA sample from the semen swabs taken from the crime scene but he needed to test comparison samples from Plaintiff, Barry Laughman, and the victim in order to draw any meaningful conclusions.

80.  Professor Stoneking, upon information and belief, requested the comparison samples from the PCRA attorney but never received a response.

81.  In 2003 Pete Shellem, an investigative reporter for the *Patriot-News* (Harrisburg, Pennsylvania), started looking into the Edna Laughman murder case and tracked the DNA evidence to Professor Stoneking, who had taken it to the Max Planck Institute for Evolutionary Anthropology in Leipzig, Germany in 1998 where he was doing research.

82.  Undersigned counsel's office undertook representation of Plaintiff, Barry Laughman, *pro bono publico*, investigated and reviewed his case, and contacted Professor Stoneking.

83.  On June 18, 2003 undersigned counsel's office filed a motion for postconviction DNA testing pursuant to 42 Pa.C.S.A. 9543.1; Paul Dean, then District Attorney of Adams County, did not oppose the motion.

84. On June 20, 2003 the Honorable John D. Kuhn, President Judge of Adams County, granted the motion and ordered that Professor Stoneking transport the aforesaid DNA evidence to the United States and that it be tested and compared to DNA samples obtained from Plaintiff, Barry Laughman.

85. Professor Stoneking subsequently brought the aforesaid DNA evidence to the United States where representatives of undersigned counsel's office and the District Attorney's Office immediately transported it to the Orchid Cellmark laboratory in Germantown, Maryland.

86. Submitted to Orchid Cellmark for testing were semen swabs taken from the victim's body and three swabs of the saliva of Plaintiff, Barry Laughman, for comparison purposes.

87. By report dated November 5, 2003, the Orchid Cellmark's molecular geneticist and DNA analyst concluded as follows: "Results were obtained for the liquid in the microtube labeled 9406B at 3 of 4 loci tested. Based on this data, Barry Laughman is excluded as a source of the DNA obtained from this sample."

88. The semen on the victim's body was not from Plaintiff, Barry Laughman.

89. Plaintiff, Barry Laughman, is actually innocent of the rape and murder of Laughman as a matter of fact and as a matter of law based on the aforesaid exculpatory DNA evidence.

90.  On November 12, 2003, undersigned counsel's office filed a petition for postconviction relief under the Pennsylvania Postconviction DNA Testing Act, 42 Pa.C.S.A. 9543.1, and sought PCRA bail for Plaintiff, Barry Laughman.

91.  Following a bail hearing on November 21, 2003, Judge Kuhn ordered the release of Plaintiff, Barry Laughman, after more than 16 years of imprisonment, on PCRA bail with the conditions of house arrest and supervision by Adult Probation. He returned to the same job he held stacking skids at Miller Chemical in 1987.

92.  The new District Attorney of Adams County, Shawn Wagner, took office in January 2004, reviewed the case, and had additional DNA testing performed on samples taken from Edna Laughman's body at Orchid Cellmark which confirmed its original conclusions: Plaintiff, Barry Laughman, was and is excluded as the source of the DNA found on the victim.

93.  Following a brief PCRA hearing on August 26, 2004, Judge Kuhn, without opposition from the Commonwealth, granted a new trial to Plaintiff, Barry Laughman, dismissed the charges against him, and ordered his immediate discharge.

94.  After over 16 years in prison for crimes he did not commit, Plaintiff, Barry Laughman, is again a free man.

95.  The arrest, prosecution, conviction, sentencing and imprisonment of Plaintiff, Barry Laughman, resulted from an egregious violation of his rights afforded

him by the United States Constitution and the Pennsylvania Constitution by all the Defendants.

## FIRST CAUSE OF ACTION

## FEDERAL CONSTITUTIONAL CLAIMS: 42 U.S.C.A. 1983

96.  The averments set forth in paragraphs 1 through 95 above are incorporated herein as if set forth in full.

**A.   Defendants Commonwealth, County, District Attorney's Office, Holtz, Blevins and Roadcap**

97.  As alleged herein, Defendants Troopers Holtz and Blevins and Chemist Roadcap, acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, conspired to have Plaintiff, Barry Laughman, arrested, tried, convicted, sentenced and imprisoned for crimes they knew he did not commit.

98. Defendants Troopers Holtz and Blevins, acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, knowingly and intentionally employed unlawful and impermissible interrogation techniques against Plaintiff, Barry Laughman, who was mentally retarded, in order to elicit a false  and fabricated confession from him, including the use of trickery, deceit, coercion and the suggestion

of facts and evidence not known to him, all in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; this false and fabricated confession caused the jury to convict him wrongly of raping and murdering the victim.

99.  Defendants Troopers Holtz and Blevins and Chemist Roadcap acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, knowingly and intentionally caused Chemist Roadcap's original lab notes to be "doctored" or modified to indicate that the Type B antigens could have broken down in an effort to explain the discrepancy between the B blood-type of Plaintiff, Barry Laughman, and that of the semen found on the victim, which was deposited by a Type A blood secretor, which was "junk science" and had no basis in fact or in science; this "doctoring" or modification of her original lab notes caused the jury to convict him wrongly of raping and murdering the victim, all in violation of his rights under the Fourteenth Amendment to the United States Constitution.

100.  Defendants Troopers Holtz and Blevins and Chemist Roadcap, acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, knowingly and intentionally caused the aforesaid evidence taken from the victim's

body to be stored in an evidence locker for 8 months after testing where it degraded and was rendered useless for independent testing by the defense, thereby depriving Plaintiff, Barry Laughman of the very evidence which would have exonerated him at trial, all in violation of his rights under the Fourteenth Amendment to the United States Constitution. Indeed, Judge Spicer gave the following extraordinary instruction to the jurors at the death-penalty hearing:

> Members of the panel, one thing I think I would be very remiss about telling you if I did not tell you this, the death penalty the requirements before it can be made are purposely made rather difficult. I think you can see the verdict slip, it's not something that you will simply fill out and return with in just a matter of moments. The death penalty, of course, is a final sentence and **I think one of the things that you should consider in this particular case is the destruction of scientific [evidence] or the specimens that might have exonerated the Defendant**. So that would be a mitigating circumstance if you find it to be but I think that's one of the things that you would consider in the record or circumstances in this case.

*See* Trial N.T. 1135-1136; emphasis supplied. The absence of this exculpatory evidence directly resulted in the jury convicting him of raping and murdering the victim.

101. Defendants Troopers Holtz and Blevins, acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, knowingly and intentionally testified falsely against Plaintiff, Barry Laughman, at trial and related

proceedings, particularly as to the false and fabricated confession they obtained from him and the blood-type/secretor evidence and testimony of Defendant Chemist Roadcap all in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution; this false testimony directly resulted in his conviction for raping and murdering the victim.

102.  Defendant Chemist Roadcap, acting under the color of state law in her position with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, knowingly and intentionally testified falsely against Plaintiff, Barry Laughman, at trial and related proceedings, particularly as to her phony "junk science" explanations for the discrepancy between Plaintiff's Type B blood and the Type A blood found in the semen on the victim's body which had no basis in fact or in science, all in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution; this false testimony directly resulted in his conviction for raping and  murdering the victim.

103.  Defendants Troopers Holtz and Blevins, acting under the color of state law in their respective positions with the Commonwealth, the County of Adams and the Adams County District Attorney's Office, conspired with and knowingly and intentionally procured the false testimony of Defendant Chemist Roadcap, particularly as to her phony "junk science" explanations for the discrepancy between

Plaintiff's Type B blood and the Type A blood found in the semen on the victim's body which had no basis in fact or in science, all in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution; this false testimony directly resulted in his conviction for raping and murdering the victim.

104.     The aforementioned fraudulent, unlawful and deceitful conduct perpetrated by Defendants Troopers Holtz and Blevins and Chemist Roadcap, acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, is part of a persistent and troubling pattern of manipulating and falsifying evidence and testimony that exists and is condoned within certain law enforcement units of the Commonwealth and County.

105.     The aforementioned fraudulent, unlawful and deceitful conduct perpetrated by Defendants Troopers Holtz and Blevins and Chemist Roadcap, acting under the color of state law in their respective positions with the Commonwealth of Pennsylvania, the County of Adams and the Adams County District Attorney's Office, caused Plaintiff, Barry Laughman, to suffer a false arrest, malicious prosecution, denial of a fair trial and cruel and unusual punishment, and to unnecessarily, illegally and wrongfully spend over 16 years of his life in prison for crimes he did not commit.

106.     The aforementioned fraudulent, unlawful and deceitful conduct

perpetrated by Defendants Troopers Holtz and Blevins and Chemist Roadcap, acting

under the color of state law in their respective positions with the Commonwealth of

Pennsylvania, the County of Adams and the Adams County District Attorney's Office,

caused Plaintiff, Barry Laughman, to suffer extreme emotional distress,

embarrassment, humiliation and fear, and it deprived him of any meaningful

opportunity to obtain an education, secure gainful employment, raise a family and

become a productive member of society.

107.    The aforementioned fraudulent, unlawful and deceitful conduct

perpetrated by Defendants Troopers Holtz and Blevins and Chemist Roadcap, acting

under the color of state law in their respective positions with the Commonwealth of

Pennsylvania, the County of Adams and the Adams County District Attorney's Office,

caused Plaintiff, Barry Laughman, to be deprived of his rights, privileges and

immunities secured by the Fourth and Fourteenth Amendments to the United States

Constitution.

## B. Defendants Commonwealth and PSP Commissioners

108.  Upon information and belief, Defendant Commissioners and other high-

ranking officials within the Pennsylvania State Police (PSP) had knowledge of the

aforementioned false testimony and the underlying false and fabricated confession and

other evidence and failed to take any action in response thereto.

109.   Upon information and belief, Defendant Commissions and other high-ranking officials within the PSP had knowledge of the propensity of Defendants Troopers Holtz and Blevins and Chemist Roadcap to lie under oath and/or to alter or conceal evidence and/or to obtain false and fabricated confessions and/or to conspire to wrongfully arrest, prosecute and convict innocent individuals but failed to take any appropriate corrective actions.

110.   The failure to act on the part of the highest ranking officials within the PSP, including Defendant Commissioners in this case, created and fostered an environment of concealment, misrepresentation and otherwise fraudulent behavior with respect to the egregious violation of individuals' civil rights and the PSP's actions or lack of actions with respect to addressing those violations.

111.   The aforementioned misconduct of Defendants Troopers Holtz and Blevins and Chemist Roadcap is consistent with a pattern of misconduct which has existed, been condoned and even encouraged within the PSP for at least the last 34 years.

112.   The PSP, under the direction and control of the Defendant Commissioners, operated in a closed-door, clandestine fashion and knowingly allowed and condoned its troopers, investigators, lab personnel and others to effect, inter alia, a trampling and desecration of individuals' civil rights, the offering of false testimony

before judicial tribunals, and the adulteration of test results, reports and evidence for the purpose of securing the improper arrest, conviction and imprisonment of numerous citizens, including Plaintiff, Barry Laughman.

113.   Plaintiff, Barry Laughman, has uncovered substantial evidence of the aforementioned misconduct of the PSP.  A number of these incidents are set forth in a November 1986 Report of the Special Committee to Investigate the Pennsylvania State Police (the "Report").  The Report chronicles a non-exclusive list of instances of severe police misconduct which occurred over a 5-1/2 year period from January 1, 1981 to July 1, 1986.

114.   The myriad of crimes and civil rights offenses that have become commonplace within the PSP and which were brought to light by the Report did not begin or end with the creation of the Report.  For example, Jay C. Smith was convicted of first-degree murder and sentenced to death in 1986 in the Court of Common Pleas of Dauphin County, Pennsylvania for the murder of a woman and her two small children.  Defendant Trooper Holtz was the affiant in that case and later admitted to agreeing to receive some $45,000 *during trial* from a noted crime author for his assistance and cooperation.  Payment had been made contingent upon Dr. Smith's arrest.

In 1992 a unanimous Pennsylvania Supreme Court overturned Dr. Smith's

conviction and ordered his discharge on state double jeopardy grounds based on egregious police and prosecutorial misconduct. This misconduct consisted of the intentional withholding and suppression of exculpatory physical evidence and knowingly denying that it had a secret deal with the prosecution's chief witness, a jailhouse informant and disgraced ex-cop. *See Commonwealth v. Smith*, 615 A.2d 321 (Pa.1992).

115.  More recently, there has been widespread media attention directed at the voluminous number of allegations of criminal behavior and wrongdoing by over 100 PSP troopers in the last several years.

116.  For example, Stephen Crawford was thrice convicted of murdering a newspaper boy in Dauphin County. At his 1978 trial, two PSP officials – Trooper John Balshy and Defendant Chemist Roadcap – testified falsely that the blood on a certain palm print found on a car owned by Mr. Crawford's father was limited to the ridge area of the print. This was critical to the prosecution's case because the testimony that the blood was limited to the print and not diffused across the print was used to argue that Mr. Crawford's prints were not on the car prior to the murder and sprayed with blood from the injuries inflicted upon the victim as suggested by the defense but, rather, were placed there by Mr. Crawford shortly after the murder.

117.  Many years later, copies of the original lab notes of Defendant Chemist

Roadcap were discovered and they read in part as follows: "This reaction was greater along the ridges of the fingerprint, however numerous particles in the valleys also gave [positive] reactions." This statement was consistent with the theory advanced by Mr. Crawford's defense team, which included undersigned counsel, and contradicts the trial testimony of Trooper Balshy and Defendant Chemist Roadcap.

118. The disparity between Defendant Chemist Roadcap's exculpatory lab notes and her incriminatory report not only suggests that her trial testimony was false but that she and Trooper Balshy jointly suppressed this exculpatory evidence and hid it from Mr. Crawford and his lawyers.

119. Following the filing of a PCRA petition, the Dauphin County District Attorney's Office in June 2002 conceded that Mr. Crawford was entitled to a new trial and, on July 16, 2002, the Court granted the Commonwealth's motion to dismiss the charges; Mr. Crawford was set free after spending 28 years in prison for crimes he did not commit.

120. The misconduct of the PSP is not limited to central Pennsylvania. For example, the 1986 Fayette County conviction of David Joseph Muchinski for murder was recently vacated based on the intentional concealment of crucial, exculpatory statements by the PSP and the prosecution.

121. In 1984, a federal jury in Harrisburg found that Troopers Balshy, Dean

Shipe and Joseph Van Nort (the original investigator in the Jay C. Smith case and Defendant Trooper Holtz's partner) had violated the civil rights of Gary Rank by planting a fingerprint at a murder scene and testifying against him at trial; he was awarded $40,500 in compensatory damages and $15,000 in punitive damages.  *See Rank v. Balshy, et al.*, 590 F.Supp. 787, 789, 792-793 (M.D.Pa.1984).  Defendants Trooper Holtz and Chemist Roadcap were also involved in the underlying criminal case.

122.  Moreover, a different PSP chemist recently resigned her position after it was discovered that she mishandled evidence in hundreds of cases.

123.  Additionally, in 2000 and 2001, several women filed sexual harassment lawsuits in the United States District Court for the Eastern District of Pennsylvania against five PSP supervisors alleging that ex-Trooper Michael Evans, a convicted sexual predator, had sexually harassed and assaulted them on numerous occasions. Federal Judge Rufe in an opinion wrote that "[the record contains evidence which could support a finding that [the five supervisors] encouraged, condoned, tolerated and approved of Evans' pattern of sexual misconduct."  The PSP, acknowledging its liability, publicly settled with these victims for some $5 million.

124.  These aforementioned acts are indicative of a pattern of corrupt behavior which has permeated the ranks of the PSP for at least 34 years while under the

direction and control, and with the knowledge and consent of, the Defendant Commissioners.

125.   The "doctoring" or modifying of the original lab notes by Defendant Chemist Roadcap, permitting exculpatory evidence to degrade, the obtaining of a false and fabricated confession by Defendant Troopers Holtz and Blevins, and all of their false and perjurious testimony at trial against Plaintiff, Barry Laughman, were consistent with a pattern and practice known and condoned by the Defendant Commissioners, the highest ranking PSP officials, and led directly to the arrest, conviction and imprisonment of Plaintiff for crimes he did not commit, all in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

126.   Defendant Commissioners, having knowledge of the corrupt actions of their subordinates, which permeated the ranks of the PSP, failed to install and implement sufficient safeguards to prevent their agents and employees from altering evidence, concealing exculpatory evidence, permitting it to degrade, obtaining false and fabricated confessions, and from testifying falsely.

127.   Defendant Commissioners, having knowledge of the corrupt actions of their subordinates which permeated the PSP, failed to adequately train their employees so as to prevent them from altering evidence, concealing exculpatory evidence, permitting it to degrade, obtaining false and fabricated confessions, and testifying

falsely.

128.  Defendant Commissioners,  having knowledge of the corrupt actions of their subordinates which permeated the PSP, failed to adequately supervise their agents and, in fact, fostered an environment that encouraged their agents to alter evidence, conceal exculpatory evidence, permit it to degrade, obtain false and fabricated confessions and to testify falsely.

129. Defendant Commissioners, having knowledge of the corrupt actions of their subordinates which permeated the PSP, failed to address and correct the rampant trampling and desecration of individuals' civil rights that was commonplace within the practices and throughout the ranks of the PSP and, in fact, failed to discipline any of these individuals.

130.  The arrest, conviction and imprisonment of Plaintiff, Barry Laughman, resulted from the Defendant Commissioners' egregious violation of his civil rights afforded him by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 1, 8, 9 and 26 of the Pennsylvania Constitution.

131.  The aforementioned conduct of all the Defendants, including those acting under the color of state law with their respective positions with the PSP, caused Plaintiff, Barry Laughman, to suffer extreme emotional distress, embarrassment,

humiliation and fear; it deprived him of any meaningful opportunity to obtain an education, secure gainful employment, raise a family and become a productive member of society; and it violated his rights to be free from unlawful arrest, malicious prosecution, unlawful incarceration, cruel and unusual punishment, intimidation, abuse of public trust and public office, unlawful restraint, abuse of process, misuse of process and to due process of law under the United States Constitution and Federal law.

## C.  Defendants Commonwealth, County of Adams and Adams County District Attorney's Office

132.  Defendants Commonwealth, the County of Adams and the Adams County District Attorney's Office lacked sufficient safeguards to prevent their agents from altering evidence, from concealing exculpatory evidence, from permitting and causing it to degrade, from obtaining false and fabricated confessions, and from testifying falsely.

133.  Defendants Commonwealth, the County of Adams and the Adams County District Attorney's Office failed to adequately train their agents so as to prevent them from altering evidence, from concealing exculpatory evidence, from permitting and causing it to degrade, from obtaining false and fabricated confessions, and from testifying falsely.

134.  Defendants Commonwealth, the County of Adams and the Adams County District Attorney's Office, through their lack of sufficient supervision, fostered an environment that encouraged their agents to alter evidence, conceal exculpatory evidence, permit and cause it to degrade, obtain false and fabricated confessions, and testify falsely.

135.  The actions taken by the individual Defendants in this case are part of a pattern of improper, unlawful and unconstitutional conduct encouraged and condoned by Defendants Commonwealth, the County of Adams and the Adams County District Attorney's Office, all in violation of Plaintiff's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

136.  Defendant, Adams County District Attorney's Office, acting in its administrative capacity as custodian of the exculpatory forensic evidence, caused the unlawful conviction, sentencing and imprisonment of Plaintiff, Barry Laughman, by deliberately, intentionally and maliciously failing to preserve the aforesaid exculpatory evidence, permitting and causing it to degrade, and failing to provide it to the defense in a timely manner, thereby preventing Plaintiff from affirmatively proving his innocence at trial because such evidence would have exonerated him. This conduct was a matter of official practice, custom and policy and resulted from decisions made by the final policymakers in the Office of District Attorney directly

or by specific delegation of authority. All such decisions were ratified by then District Attorney Keefer. All of these actions were in violation of Plaintiff's rights to due process and equal protection of the laws, to access to the courts, to be free from unlawful arrest and conviction, to a fair trial, to be free from unlawful incarceration, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments. Finally, these decisions and actions pertaining to the aforesaid exculpatory evidence deprived Plaintiff of his right to exculpatory evidence, to make a conclusive showing of innocence, and to access to established judicial process for post-conviction and/or habeas corpus relief.

137. Defendant, County of Adams, is separately liable for the conduct of the Office of District Attorney in deliberately, intentionally and maliciously failing to preserve the exculpatory forensic evidence, permitting and causing it to degrade, and failing to provide it to the defense in a timely manner because that evidence would have exonerated Plaintiff, Barry Laughman. Former District Attorneys and deputy district attorneys acted as the final policymakers for the County of Adams and the Office of District Attorney in the handling of the aforesaid exculpatory forensic evidence, and their failure was a matter of official practice, custom and policy directed against Plaintiff and resulted from decisions made by the final policymakers in the Office of District Attorney directly or by specific delegation of authority. Further, the

County of Adams is liable for the policies and practices of the Office of District Attorney as alleged herein, including the failure to properly oversee and supervise its agents, including Defendants Troopers Holtz and Blevins and Chemist Roadcap.

## SECOND CAUSE OF ACTION

## STATE CONSTITUTIONAL AND LAW CLAIMS

138.   The allegations set forth in paragraphs 1 through 137 above are incorporated herein by reference as if set forth in full.

139.  The actions of all the Defendants violated the rights of Plaintiff, Barry Laughman, afforded him by Article I, Sections 1, 8, 9 and 26 of the Pennsylvania Constitution and enforcing legislation and procedural rules and regulations, and this Honorable Court has supplemental jurisdiction to hear and adjudicate these state claims.

140.   The aforementioned conduct of all the Defendants, including those acting under the color of state law with their respective positions with the PSP, caused Plaintiff, Barry Laughman, to suffer extreme emotional distress, embarrassment, humiliation and fear; it deprived him of any meaningful opportunity to obtain an education, secure gainful employment, raise a family and become a productive member of society; and it violated his rights to be free from unlawful arrest, malicious prosecution, unlawful incarceration, cruel and unusual punishment, intimidation,

abuse of public trust and public office, unlawful restraint, abuse of process, misuse of process and to due process of law under the Pennsylvania Constitution and Pennsylvania state law and procedural rules and regulations.

## DEMAND FOR JURY TRIAL

Plaintiff, Barry Laughman, hereby demands a trial by jury for all issues so triable.

## CONCLUSION

WHEREFORE, Plaintiff, Barry Laughman, based on the foregoing averments, respectfully requests that Your Honorable Court:

a) enter judgment in his favor and against all the Defendants, jointly and severally;

b) award him compensatory and punitive damages;

c) award him attorney's fees pursuant to 42 U.S.C.A. 1988 and costs of suit; and

d) order such other relief as it may deem appropriate and just under the circumstances of this case.

RESPECTFULLY SUBMITTED:


*/s/ William C. Costopoulos, Esquire*
William C. Costopoulos, Esquire
PA I.D. No. 22354
Leslie M. Fields, Esquire
PA I.D. No. 29411
COSTOPOULOS, FOSTER & FIELDS
831 Market Street/P.O. Box 222
Lemoyne, PA 17043
Phone: (717) 761-2121
ATTORNEYS FOR PLAINTIFF


DATED: May 20, 2005.